UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| JAIME BECK, BYRON HANSON, and LYNN MELCHER, | Case No. 19-CV-1453 (PJS/ECW) |
| Plaintiffs, | |
| v. | ORDER |
| WILLIAM F. AUSTIN; BRANDON SAWALICH; JEROME RUZICKA; SCOTT A. NELSON; LAWRENCE W. MILLER; W. JEFFREY TAYLOR; JEFFREY LONGTAIN; STARKEY LABORATORIES, INC.; | |
| Defendants. | |

---

Kate M. Baxter-Kauf, Gregg M. Fishbein, Arielle S. Wagner, and Kristen G. Marttila, LOCKRIDGE GRINDAL NAUEN P.L.L.P., for plaintiffs.

Scott A. Neilson and David Bradley Olsen, HENSON & EFRON, P.A. for defendants William F. Austin, Brandon Sawalich, and Starkey Laboratories, Inc.

Defendant Starkey Laboratories, Inc. ("Starkey") is a privately held Minnesota corporation that manufactures hearing aids. From 2006 to 2015, Starkey was the victim of fraudulent schemes perpetrated by some of its high-level executives and their coconspirators. All told, these thieves stole approximately $30 million from Starkey.

Plaintiffs Jaime Beck, Byron Hanson, and Lynn Melcher were participants in Starkey's employee stock ownership plan ("ESOP"). Plaintiffs bring this putative class action asserting claims under the Employee Retirement Income Security Act ("ERISA"),

29 U.S.C. § 1001 et seq., the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and common law arising out of the fraudulent schemes and the failure to detect and prevent them.

This matter is before the Court on a motion to dismiss brought by three defendants: Starkey, William Austin (founder and CEO of Starkey), and Brandon Sawalich (president of Starkey).[1]  For the reasons that follow, the Court grants the motion in part and denies it in part.

## I.  BACKGROUND

### A.  The Fraud

Until 2015, defendants Jerome Ruzicka, Scott Nelson, and Lawrence Miller were, respectively, Starkey's president, chief financial officer, and senior vice president of human resources.  Am. Compl. ¶¶ 13-15.  Ruzicka was also a trustee of the ESOP and Nelson and Miller were ESOP administrators for periods of time.  Am. Compl. ¶¶ 24-26.  Defendant Jeffrey Longtain was the president of Northland Hearing Centers ("NHC"), a wholly owned subsidiary of Starkey.  Am. Compl. ¶ 17.  Defendant W. Jeffrey Taylor was the president of Sonion, U.S. ("Sonion"), a company that did business with Starkey.  Compl. ¶ 16.  The Court will refer to these five defendants collectively as the "RICO defendants."

---

[1]Unless otherwise indicated, the terms "defendants" and "fiduciary defendants" refer only to Starkey, Austin, and Sawalich.

From at least 2006 until September 2015, the RICO defendants engaged in various schemes to defraud Starkey.  Am. Compl. ¶ 28.  Broadly speaking, there were three types of fraud:

*First*, Ruzicka and Taylor formed a sham company called Archer Consulting ("Archer") and caused it to bill Starkey for services that it did not provide.  Am. Compl. ¶¶ 28, 33.  Between 2006 and 2015, Ruzicka and Taylor embezzled $7,650,000 from Starkey by issuing false invoices from Archer to Starkey.  Am. Compl. ¶ 33.  Beginning in 2006, Ruzicka also had Starkey pay Archer a "commission" on all sales by Sonion to Starkey.  Am. Compl. ¶ 34.  Ruzicka and Taylor later called these payments "consulting fees."  Am. Compl. ¶ 35.  They signed and back-dated a consulting agreement under which Starkey agreed to pay $75,000 per month to Archer.  Am. Compl. ¶ 35.  Ruzicka and Taylor pocketed those payments.  Am. Compl. ¶ 35.

*Second*, Ruzicka and Nelson formed NHC as a subsidiary of Starkey's Northland retail subsidiary.  Am. Compl. ¶ 37.  Ruzicka and Nelson caused NHC to issue 100,000 shares of restricted stock—51,000 shares to themselves and Longtain, and 49,000 shares to Starkey.  Am. Compl. ¶¶ 28, 37.  As a result, Starkey went from owning all of its Northland subsidiary to effectively owning only 49 percent of it.  Am. Compl. ¶ 37.  This reduction in Starkey's assets reduced the value of Starkey for purposes of determining ESOP contributions, resulting in an underfunded ESOP.  Am. Compl. ¶ 28.

In 2013, Ruzicka caused NHC to pay himself, Nelson, and Longtain approximately $15 million in exchange for terminating the restricted stock grants.  Am. Compl. ¶¶ 28, 40.

Third, Ruzicka, Nelson, and Miller embezzled money from Starkey by taking unauthorized bonuses and other payments and causing Starkey to purchase luxury items (including a condominium and a Jaguar) for their personal use.  Am. Compl. ¶¶ 28, 41-46.  To hide their misconduct, they falsified documents and lied about the purpose of various payments.  Am. Compl. ¶¶ 39, 41-42, 44-45.

### B.  Discovery and Criminal Prosecutions

Plaintiffs allege that, although Austin and the other fiduciary defendants did not themselves commit or condone any fraudulent acts, the RICO defendants were able to maintain their fraudulent schemes for so long because the fiduciary defendants breached their fiduciary duties to both the corporation and the ESOP.  Am. Compl. ¶¶ 29-31, 38, 63-66, 69, 72-74, 79-81.  Austin was the sole board member of Starkey and one of only two ESOP trustees—and yet, according to the complaint, Austin failed to monitor their operations or even read their financial documents.  Am. Compl. ¶¶ 30-31, 82.  In addition, Austin heard rumors about Northland-related misconduct as early as 2006, but did nothing to investigate those rumors at the time.  Am. Compl. ¶¶ 38, 74, 82.

Starkey began an internal investigation about an unrelated matter in July 2015. Am. Compl. ¶¶ 70-71.  During this investigation, Austin and Sawalich discovered the $15 million NHC deal, and Ruzicka later confessed to stealing about $10 million.  Am. Compl. ¶ 71.  Starkey fired Ruzicka, Nelson, and Miller in September 2015; it appears that Longtain lost his position with NHC at about the same time.  Am. Compl. ¶¶ 55-57, 59.

In September 2016, a federal grand jury indicted Ruzicka, Nelson, Taylor, and Miller on mail fraud, wire fraud, and other charges.  Am. Compl. ¶ 47; *see also United States v. Ruzicka et al.*, No. 16-CR-0246 (JRT/SER) (D. Minn. filed Sept. 21, 2016).  Nelson pleaded guilty, Ruzicka and Taylor were convicted at trial, and Miller was acquitted. Am. Compl. ¶ 3; *Miller*, No. 16-CR-0246(4) (JRT/SER), ECF No. 419.  Longtain later pleaded guilty to an information.  Am. Compl. ¶ 3; *see United States v. Longtain*, No. 17-CR-0046 (JRT) (D. Minn. filed Mar. 1, 2017).

### C.  The ESOP

Starkey established the ESOP in 2004.  Am. Compl. ¶ 21.  As noted, Starkey is a privately held corporation; it is owned exclusively by Austin and the ESOP.  Am. Compl. ¶ 11.  As of December 31, 2013, Austin held 93.6% of Starkey's outstanding shares and the ESOP held the remaining 6.4%.  Am. Compl. ¶ 50.  The ESOP was funded exclusively with employer contributions.  The amount of Starkey's

contributions depended on the amount of its profits; the higher the profits, the higher the contributions.  Am. Compl. ¶¶ 22, 60.

Starkey is taxed as a subchapter S corporation under federal and state tax laws, which means that stockholders must separately account for Starkey's income, deductions, losses, and credits.  Am. Compl. ¶ 60.  The ESOP itself therefore owns a share of Starkey's assets.  Am. Compl. ¶ 60.  Consequently, the fraudulent schemes not only harmed the ESOP by diminishing Starkey's profits and therefore the basis on which annual contributions were calculated; the schemes also stole directly from the ESOP.  Am. Compl. ¶¶ 51, 60.

As noted, Austin and Ruzicka both served as ESOP trustees.  Am. Compl. ¶¶ 23-24.  Sawalich also served as an ESOP trustee from 2016 until late 2017, when he and Austin were replaced by Horizon Bank.  Am. Compl. ¶¶ 23, 27.  Nelson and Miller both served as ESOP administrators and were therefore also fiduciaries.  Am. Compl. ¶¶ 25-26.

Following discovery of the fraud, the ESOP was frozen effective December 31, 2017, and all contributions were discontinued except for 2017-plan-year contributions that had been, or would be, approved by Austin.  Am. Compl. ¶ 21.

*D.  Settlement and Release*

As noted, Horizon Bank became the trustee of the ESOP in late 2017.  Am.

Compl. ¶ 23.  In May 2019, Horizon Bank, on behalf of the ESOP,  entered into a

"Settlement Agreement and Release" with Starkey and Austin.  Am. Compl. ¶ 88; *see*

Neilson Decl. ¶ 9 & Ex. H.  The release provides, in relevant part:

> Horizon Bank, in its capacity as independent trustee of the
> ESOP, and on behalf of the ESOP and all current and former
> participants and beneficiaries of the ESOP . . . hereby
> completely remises, releases, holds harmless and forever
> discharges Starkey and Austin of and from any and all
> causes of action, claims, debts, demands, damages, costs,
> attorneys' fees and expenses, known or unknown, accrued
> or unaccrued, contingent or not contingent, of every nature
> and kind, both at law and in equity, whether federal, state or
> common law, that Horizon had, has or might have against
> Starkey and Austin relating to the Claims or this Settlement
> Agreement . . . .

Neilson Decl. Ex. H ¶ 5.  "Starkey" is defined broadly to include not only the company

itself, but its "past and current directors, officers, employees, subsidiaries, affiliates,

shareholders, attorneys, agents, predecessors, successors, assigns, and insurers[.]"  *Id.*

at 1.  "Claims" is also defined broadly as claims relating to

> the alleged impact, if any, upon the ESOP resulting from the
> crimes and other malfeasance set forth in the matter of
> *United States v. Jerome C. Ruzicka, et al.*, Case No. 16-CR-246,
> United States District Court for the District of Minnesota, the
> 2018 conviction of Jerome C. Ruzicka (Starkey's fired former
> president) and the 2017 guilty pleas of Scott A. Nelson
> (Starkey's fired former CFO) and Jeffrey L. Longtain (the

-7-

> fired former president of Starkey's largest subsidiary), other
> allegations appearing in the media, the impact of Starkey's
> business decisions, business practices, distributions,
> accounting and financial statements on the valuation of the
> ESOP, the contributions and the value of contributions to the
> ESOP by Starkey, the actions of Starkey and Austin with
> respect to the Company and the ESOP, including personal,
> co-fiduciary and fiduciary duties and liabilities, including
> possible claims under federal laws relating to the Employee
> Retirement Income Security Act of 1974, as amended
> ("ERISA") and under Minnesota law . . . .

*Id.* at 1-2.  In short, in the settlement agreement, the ESOP released just about everyone

who could conceivably be held liable to it from just about every claim that the ESOP

could conceivably pursue.  In return for the broad release, the ESOP was paid $800,000

by Starkey.  *Id.* ¶ 2.

## II.  ANALYSIS

### A.  *Standard of Review*

In reviewing a motion to dismiss for failure to state a claim under Fed. R. Civ.

P. 12(b)(6), a court must accept as true all of the factual allegations in the complaint and

draw all reasonable inferences in the plaintiff's favor.  *Aten v. Scottsdale Ins. Co.*, 511 F.3d

818, 820 (8th Cir. 2008).  Although the factual allegations need not be detailed, they

must be sufficient to "raise a right to relief above the speculative level . . . ."  *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The complaint must "state a claim to relief

that is plausible on its face."  *Id.* at 570.

*B.  Release*

The fiduciary defendants move to dismiss all of the claims against them on the ground that those claims have been settled and released.  Plaintiffs do not dispute that all of their claims—which they are asserting on behalf of the ESOP—fall within the scope of the release (with the exception of their claims against Taylor, the former president of Sonion).  Instead, plaintiffs argue that, under the collateral-source rule, the release is ineffective with respect to the individual defendants.  Specifically, plaintiffs argue that, because Starkey was the sole source of funds for the settlement payment, the payment is a "collateral source" as to the individual defendants and cannot operate to bar claims against them.

This argument is plainly meritless.  "The collateral source rule provides in general that compensation received from a third party will not diminish recovery against a wrongdoer."  *Hubbard Broad., Inc. v. Loescher*, 291 N.W.2d 216, 222 (Minn. 1980).  This doctrine generally applies when the plaintiff has been harmed by a tortfeasor and has been indemnified for that harm under an insurance policy.  This doctrine has no application whatsoever when the plaintiff enters into a settlement agreement in which the settling party pays the plaintiff to release not only its claims against the settling party, but also its claims against others.  Such agreements are ubiquitous; they must number in the millions.  And yet plaintiffs have not cited, and the

Court has not found, a single judicial decision suggesting that a plaintiff can enter a settlement agreement under which it expressly agrees to release its claims against the paying party and other parties in return for money, accept that money from the paying party, and then turn around and sue the very parties whom it was just paid to release. *See*, *e.g.*, *Merriam v. Demoulas*, No. 11-10577-RWZ, 2013 WL 2422789, at *3 (D. Mass. June 3, 2013) ("I note in passing that the collateral source rule may not apply to payments that are made 'seeking to extinguish or reduce the obligation' that a tortfeasor owes a plaintiff." (quoting Restatement (Second) of Torts § 920A cmt. a)).  The Court rejects plaintiffs' argument—as well as their closely related argument that the settlement operates only as an offset rather than a bar.

Plaintiffs next argue that the release was a prohibited transaction and thus is invalid unless it meets the requirements of the Prohibited Transaction Exemption ("PTE") 2003-39, 68 Fed. Reg. 75632-01 (Dec. 31, 2003).  *See* 29 U.S.C. § 1108(a) (granting the Department of Labor authority to grant exemptions from ERISA's prohibited-transaction provisions).  The parties dispute whether plaintiffs must plead facts that plausibly call into question the validity of the release under PTE 2003-39.  Plaintiffs argue that they are under no obligation to plead that their claims were *not* released—or, more specifically, to plead that the release did *not* meet the requirements of PTE 2003-39—because release is an affirmative defense that must be pleaded and proved by

the defendants.  *See* Fed. R. Civ. P. 8(c)(1) (identifying "release" as an affirmative

defense); *cf. Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009) (it was error

to require the plaintiff to plead facts raising a plausible inference that payments were

not subject to a § 1108(b) exemption because "the statutory exemptions established by

§ 1108 are defenses which must be proven by the defendant").  Defendants disagree

and, citing *Adepipe v. U.S. Bank, National Association*, argue that plaintiffs must make

some kind of showing as to invalidity under PTE 2003-39 in order to get past the

pleading stage and be entitled to discovery.  62 F. Supp. 3d 879, 908 (D. Minn. 2014),

*aff'd sub. nom. Thole v. U.S. Bank, Nat'l Ass'n*, 873 F.3d 617 (8th Cir. 2017), *aff'd* 140 S. Ct.

1615 (2020).[2]

       The Court need not resolve the parties' dispute about what, if anything, plaintiffs

were required to plead about the validity of the release under PTE 2003-39.  Defendants

do not contend that the release was in effect at the time that plaintiffs filed their

amended complaint.  Indeed, defendants do not contend that the release was in effect at

the time that they moved to dismiss the amended complaint.  Instead, defendants

argued in their opening brief that "[t]he release of claims will become effective if the

second independent fiduciary, retained pursuant to the procedures set forth by [PTE

_____

       [2]*Adepipe* is distinguishable, however, as it addressed the validity of a release in
the context of a motion for summary judgment.  62 F. Supp. 3d at 905.  Defendants
suggest that the Court could convert their motion into one for summary judgment.  ECF
No. 40 at 7.  The Court declines to do so.

2003-39], approves the settlement terms as reasonable."  ECF No. 40 at 1; *see* PTE 2003-39, 68 Fed. Reg. at 75639 (requiring that the fiduciary that authorized the settlement have "no relationship to, or interest in, any of the parties involved in the litigation, other than the plan, that might affect the exercise of such person's best judgment as a fiduciary"); *id.* at 75638 (noting that "in some instances where there are complex issues and significant amounts of money involved, it may be appropriate to hire an independent fiduciary having no prior relationship to the plan, its trustee, any parties in interest, or any other parties to the litigation").

As a result, even if plaintiffs generally bear the burden of pleading facts that plausibly call into question the validity of a release, that obligation cannot possibly apply to a plaintiff who files a complaint when no such release *exists*.[3]  The Court therefore denies defendants' motion to dismiss insofar as it is premised on their argument that the claims have been released.

That said, the Court believes that it is quite likely that plaintiffs' claims (save for those against Taylor) are in fact barred by the release.  In order to spare the parties from incurring the considerable expense of engaging in full discovery on the merits of claims that appear to have been released—and recognizing that Starkey paid $800,000 to the

---

[3]The release states that its "Effective Date" is May 7, 2019, which is before plaintiffs filed their amended complaint.  As noted, however, defendants concede that the release did not take effect until it was approved by the independent fiduciary that was retained to review it.  That occurred after plaintiffs filed their amended complaint.

ESOP so that the defendants would not have to bear the costs of litigating claims brought on behalf of the ESOP—the Court will bifurcate discovery.  The first phase of discovery will be strictly limited to matters relevant to the validity of the release under PTE 2003-39.  The Court will then determine if the release is valid.  If the Court determines that the release is invalid—or that a jury must decide the question of validity—then the parties can engage in a second phase of discovery on the merits of the claims and defenses involved in this litigation.

The Court recognizes that one of the factors that must be considered in deciding whether the release is valid under PTE 2003-39 is whether "the settlement is reasonable in light of the plan's likelihood of full recovery, the risks and costs of litigation, and the value of claims foregone."  68 Fed. Reg. 75,632, at 75,639.  The Court expressed concern at oral argument that limited discovery into the reasonableness of the settlement might not be much narrower than full discovery into the merits of the case.  On reflection, however, the Court believes that, properly cabined, discovery into the reasonableness of the settlement should be considerably less onerous than full merits discovery.  After all, courts commonly review the reasonableness of settlements in other contexts—such as under Fed. R. Civ. P. 23(e)—without the parties' first engaging in full discovery into the merits.

The key question is whether, given what was known about the case *at the time of settlement*, the settlement was reasonable "in light of the plan's likelihood of full recovery, the risks and costs of litigation, and the value of claims forgone." *Id.* (emphasis added). These are *predictions* that were made at a particular point in time. The parties can litigate over the reasonableness of those predictions without taking full discovery into the merits of this lawsuit.

### C.  Failure to Sue

Defendants move to dismiss plaintiffs' fiduciary-duty claims to the extent that those claims are focused on Austin's and Sawalich's actions after September 2015, when the fraud was discovered.[4]

To state a claim for breach of fiduciary duty, "a plaintiff must make a prima facie showing that the defendant acted as a fiduciary, breached its fiduciary duties, and thereby caused a loss to the Plan." *Braden*, 588 F.3d at 594.  Although plaintiffs allege that Austin and Sawalich breached their fiduciary duties in a variety of ways, the only

---

[4]Although defendants' motion is focused on Austin's and Sawalich's conduct after the discovery of the fraud in 2015, their briefing is unclear as to whether they consider that discovery to have occurred in July (when Starkey began an internal investigation) or in September (when Ruzicka, Nelson, Miller, and Longtain lost their jobs).  At oral argument, the fiduciary defendants indicated that they were moving to dismiss the post-July 2015 fiduciary-duty claims.  ECF No. 59 at 83.  Due to the ambiguity in the briefing, however, it is unclear to the Court whether plaintiffs claim that the fraud schemes continued after July.  The Court will therefore confine its discussion to the period following the September terminations, as there is no dispute that the RICO defendants' fraudulent schemes had ended by that point.

alleged breach that occurred *after September 2015* and that could have caused a loss to the ESOP is the failure of Austin and Sawalich to bring a lawsuit on behalf of the ESOP.[5] *See Martin v. Feilen*, 965 F.2d 660, 667 (8th Cir. 1992) (recognizing that an ESOP can pursue minority stockholder claims and that the decision not to do so is an exercise of plan administration governed by ERISA's fiduciary duties).

To state a claim for breach of fiduciary duty based on a fiduciary's failure to sue, a plaintiff must plausibly allege some harm to the plan arising from that failure, such as the plan's loss of its right to sue. *Cf. Martin v. Consultants & Adm'rs, Inc.*, 966 F.2d 1078, 1089 (7th Cir. 1992) ("it is not until the trustees' delay in bringing suit has precluded (or at least prejudiced) their ability to recover that the DOL has a claim—and hence knowledge of a violation"); *Blankenship v. Chamberlain*, 695 F. Supp. 2d 966, 972 (E.D. Mo. 2010) ("courts have recognized that where, as here, an alleged breach of fiduciary duty lies in the failure to bring a lawsuit, the breach itself does not occur (and the cause of action therefore has not accrued) until it is no longer possible for the fiduciary to

---

[5] Plaintiffs complain about Austin's failure to seek restitution on behalf of the ESOP during the criminal prosecution. As plaintiffs conceded at oral argument, however, the ESOP, as a shareholder of the victim, was not entitled to restitution in its own right and therefore the ESOP did not suffer any damages as a result of this failure. ECF No. 59 at 124-25; *cf. Herman v. Mercantile Bank, N.A.*, 137 F.3d 584, 587 (8th Cir. 1998) (to prove a breach of fiduciary duty for failure to pursue a lawsuit, a plaintiff must prove that the lawsuit would have been successful and benefitted the plan's beneficiaries).

bring that claim—either due to the applicable statute of limitations or some other circumstance").

Citing 29 U.S.C. § 1113(2), plaintiffs assert that the ESOP lost its right to sue in September 2018, three years after Ruzicka, Nelson, Miller, and Longtain were terminated.  Even assuming that this assertion is correct,[6] Austin and Sawalich ceased being fiduciaries in late 2017, approximately nine months before that limitations period expired.  Austin and Sawalich therefore cannot be held responsible for the (alleged) loss of the ESOP's right to sue in September 2018; instead, they can be held responsible only for any harm caused by their failure to file a lawsuit while they were fiduciaries.  *See* 29 U.S.C. § 1109(b) ("No fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed . . . after he ceased to be a fiduciary.").

Plaintiffs do not allege any harm to the ESOP caused by Austin's and Sawalich's delay.  At oral argument, plaintiffs contended that the ESOP took a $15 million loss in July 2016 and that Austin should have been attempting to recover assets on behalf of the

---

[6]Notably, plaintiffs' argument assumes that the ESOP would have asserted only ERISA claims.  That is inconsistent with their amended complaint, in which they repeatedly assert that the individual defendants breached their fiduciary duties by failing to bring a shareholder derivative action under Minnesota law.  Am. Compl. ¶¶ 5, 7, 63-67, 72-74, 78, 98, 106.  Defendants argue, and plaintiffs do not dispute, that the statute of limitations for such claims is six years, *see* Minn. Stat. § 541.05, meaning that the limitations period has not yet expired (assuming that it began running in September 2015).

ESOP during this time.  ECF No. 59 at 52-53.  But plaintiffs do not allege any theory as to how Austin's failure to sue could have caused this loss.  Instead, the premise of their claims is that the ESOP suffered losses due to the RICO defendants' fraudulent activities and that Austin should have attempted to recover those losses on the ESOP's behalf.[7]  All of this may be true, but the fact remains that Austin's inaction after September 2015 did not impair the ESOP's ability to recover and therefore, under plaintiffs' theory of the case, Austin did not cause the loss.  Plaintiffs have therefore failed to state a claim for a post-September 2015 breach of fiduciary duty.

### D. Co-fiduciary Duties and Accounting

In Counts III and IV of the amended complaint, plaintiffs bring a claim for violations of co-fiduciary duties and an alternative claim for an accounting.  Defendants' only argument with respect to these claims is that they are derivative of plaintiffs' other fiduciary-duty claims and so should be dismissed.  As plaintiffs still have pending fiduciary-duty claims for pre-September 2015 conduct, however, dismissing these claims would be premature.

---

[7]At oral argument, plaintiffs alluded to the rule that, "once the ERISA plaintiff has proved a breach of fiduciary duty and a prima facie case of loss to the plan or ill-gotten profit to the fiduciary, the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by, or his profit was not attributable to, the breach of duty."  *Martin*, 965 F.2d at 671.  This does not mean, however, that a plaintiff can state a cause of action for breach of fiduciary duty by pointing to a loss that, under the plaintiff's own theory of the case, was caused by something other than the alleged breach.

*E.  Reverse Piercing*

In Count V of the amended complaint, plaintiffs plead a claim to reverse pierce the corporate veil in order to hold Starkey liable for Austin's alleged breaches of his fiduciary duties to Starkey and the ESOP.

Courts apply a two-prong test to determine whether to pierce the corporate veil. *See Victoria Elevator Co. v. Meriden Grain Co.*, 283 N.W.2d 509, 512 (Minn. 1979).  First, courts examine a number of factors to determine whether the corporation functioned as a "mere instrumentality" of the shareholder.  *Trs. of the Graphic Commc'ns Int'l Union Upper Midwest Local 1M Health & Welfare Plan v. Bjorkedal*, 516 F.3d 719, 731 (8th Cir. 2008).  These factors include:

> insufficient capitalization for purposes of corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation at time of transaction in question, siphoning of funds by dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and existence of corporation as merely facade for individual dealings.

*Victoria Elevator*, 283 N.W.2d. at 512.  Second, there must be "an element of injustice or fundamental unfairness" that justifies piercing the corporate veil.  *Id.*

Plaintiffs plead that Starkey has failed to observe corporate formalities and lacks common corporate records and practices, and that, as the dominant shareholder, Austin "siphons a vast majority of Starkey's profits."  Am. Compl. ¶¶ 142-44.  Plaintiffs also

allege that Starkey served as a facade—both for Austin to hire his relatives and transact business with family members and for Ruzicka, Nelson, Miller, and Longtain to transact their personal (unlawful) business.  Am. Compl. ¶¶ 142, 145.  Finally, plaintiffs allege that there is an element of injustice or fundamental unfairness because Austin's mismanagement permitted a massive fraud to go undetected for years.  *See* Am. Compl. ¶ 147.

These allegations are insufficient to plead a plausible basis for reverse piercing in this case.  As plaintiffs admit, Starkey conducts legitimate business, is sufficiently capitalized, pays dividends, and is solvent.  Am. Compl. ¶¶ 141, 143, 147.  Plaintiffs allege that Austin "siphons" the vast majority of Starkey's profits, but this is based on nothing more than the fact that Austin owns the vast majority of the company, Am. Compl. ¶ 143; plaintiffs do not allege that Austin takes anything to which he is not entitled.  Similarly, although plaintiffs allege that Starkey employed Austin's family members and transacted business with relatives of executives and employees, plaintiffs do not allege any unlawful or otherwise improper conduct in connection with any of this.  Finally, the fact that Ruzicka, Nelson, Miller, and Longtain fraudulently used the company to transact personal business is not relevant to whether Starkey should be liable for *Austin's* debts; plaintiffs do not contend that Austin condoned these fraudulent activities.  *Cf. Stoebner v. Lingenfelter*, 115 F.3d 576, 579 (8th Cir. 1997) (to

justify piercing, the corporation must have functioned "as the mere instrumentality *of the principals a party is attempting to reach* by piercing the corporate veil" (emphasis added)).  Indeed, as the owner of Starkey, Austin was a *victim* of these fraudulent activities.

The only relevant factor, therefore, is that Starkey does not observe corporate formalities.  Plaintiffs do not allege that Starkey failed to keep essential financial and other corporate records, however.  Instead, plaintiffs allege that Starkey failed to adopt written ethical, conflict-of-interest, and whistleblower policies or use written employment contracts.  Am. Compl. ¶ 144.  Plaintiffs also allege that, for "most or all of the class period," Starkey did not have an internal controller or auditor that reported to the board.  *Id.*  While such policies and practices might be advisable, the lack of them, standing alone, does not indicate that Starkey was a mere instrumentality of Austin.  A company need not win a corporate "best practices" award to pass muster under *Victoria Elevator.*  As there is no dispute that Starkey is and has always been a real, sufficiently capitalized business, this factor is insufficient to justify reverse piercing the corporate veil.  *Cf. Trs. of Graphic Commc'ns Int'l Union Upper Midwest Local 1-M Health & Welfare Plan v. Bjorkedal*, No. 04-CV-3371 (PJS/JJG), 2006 WL 3511767, at *13 (D. Minn. Dec. 6, 2006), *aff'd*, 516 F.3d 719 (8th Cir. 2008) ("It is important in this case—as it is in all veil-piercing cases—not to lose sight of the forest for the trees.  It does not take a

complicated multi-factor test, but only a little common sense, to recognize that P & P was a 'real' corporation and not merely a 'facade' to cover the personal dealings of its shareholders.").

Finally, even if plaintiffs could satisfy the first prong of *Victoria Elevator*, they cannot show that reverse piercing is necessary to avoid injustice or fundamental unfairness.  Plaintiffs provide no reason to believe that Austin will be unable to pay any judgment entered against him.  Moreover, if Austin's own alleged negligence were enough to justify reverse piercing, then reverse piercing would be the rule rather than the rare exception.  The Court therefore grants defendants' motion to dismiss the reverse-piercing claim.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1. Defendants' motion to dismiss [ECF No. 38] is GRANTED IN PART and DENIED IN PART.

2. The motion is GRANTED as to the following claims, and those claims are DISMISSED WITH PREJUDICE AND ON THE MERITS:

      a.      Counts I, II, and III to the extent that they are based on defendants William Austin's and Brandon Sawalich's post-September 2015 failure to bring a lawsuit on behalf of the ESOP.

      b.      Count V.

3.      The motion is DENIED in all other respects.

Dated:  August 4, 2020

      s/Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge